NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0529n.06

No. 15-4049

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 13, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KAREN ELAINE GRAVES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DAYTON GASTROENTEROLOGY, INC., | ) | SOUTHERN DISTRICT OF OHIO |
| and DAVID SCHUM, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:   DAUGHTREY, MOORE, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.   In this appeal we are asked to determine whether the harassment plaintiff Kim Graves experienced at work by defendant David Schum was based on her gender and was so objectively severe or pervasive as to constitute a discriminatory work environment.   During Graves's employment at Dayton Gastroenterology, she received two text messages from Schum that included comments about sex.   She reported the messages to her supervisor, who reprimanded Schum.   Schum then began making Graves's life difficult at work.   Graves eventually resigned from her job and filed suit against Schum and Dayton Gastroenterology, alleging discrimination based on sex stemming from a hostile work environment.   The district court granted summary judgment in favor of the defendants, concluding that Graves failed to demonstrate a genuine dispute of fact as to whether the harassment she experienced was based on her sex and whether it was sufficiently severe or

pervasive to create a hostile work environment. Because we agree that Graves was not subjected to severe or pervasive harassment based on sex, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Beginning in May 2012, Graves, a registered nurse, worked as the lead certified nurse anesthetist at Dayton Gastroenterology. Her duties in that position included managing staff in the anesthesia department, scheduling work for the other nurse anesthetists, monitoring time and attendance, developing policy and procedures, educating staff, and liaising between anesthesia staff and physicians. Graves made recommendations regarding the hiring and firing of staff to her supervisor, Craig Penno. As chief executive officer, Penno had ultimate authority to approve all employment actions.

After a couple of months as lead nurse anesthetist, Graves requested to leave the position because she wanted to focus on patient care and avoid the extra work and responsibility required by the management role. Graves remained lead nurse anesthetist until February 2013, when Schum temporarily assumed the position.

Graves and Schum had worked together since May 2012, and Graves looked upon Schum as a friend. Graves and Schum periodically exchanged text messages, but they did not discuss anything that Graves would not have talked to any other colleague about. In January 2013, while on vacation, Graves texted Schum to tell him when she would return to work and stated, "I like being on vacation. I have done nothing all week." Schum responded, "I [sic] happy for you, you just have fun and wild sex." Graves was offended by this message and felt it was inappropriate and unprofessional, but she did not convey this to Schum. A week later, Schum texted Graves

again, apparently out of the blue, saying, "You and your husband lay out a wonderful dinner an [sic] have wild sex on the table!!!!! I do think about sex all the time. I [sic] just not getting it."

The next day, Graves reported both inappropriate text messages to Penno, who spoke with Schum. Schum texted Graves an apology and sought to discuss the matter with her, but Graves refused to speak to him about anything not work-related. Schum became very angry and began treating Graves rudely. During the next two months, he allegedly addressed her curtly, refused to respond to her questions about work assignments, would not relieve her from her duties despite regularly relieving other employees, gave her the most difficult assignments, denied her lunch breaks on several occasions, threw a chart at her, failed to provide her with updated work schedules, and denied her requests for days off. Schum told Graves on numerous occasions that she brought his ill will upon herself by reporting the text messages to Penno and said that "if [she] was wondering what hell was like, [she] would soon see it here at Dayton Gastro."

Graves later alleged that Schum's actions made it "unbearable" for her to continue working at Dayton Gastroenterology and caused her to suffer nausea, anxiety, and headaches for the remainder of the time she was employed there. On March 30, 2013, Graves submitted her resignation to Dayton Gastroenterology, effective May 30. She started a new job as a nurse anesthetist for a different employer in June 2013.

Graves brought suit against Schum and Dayton Gastroenterology under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and Ohio Revised Code § 4112 for discriminating against Graves based on her gender by creating a hostile work environment. Her complaint did not include a claim of retaliation. The district court granted summary judgment to the defendants, and Graves has now appealed.

## ANALYSIS

We review the district court's grant of summary judgment and resolution of legal questions *de novo* and accept the district court's factual findings unless they are clearly erroneous. *TransAm. Assurance Corp. v. Settlement Capital Corp.*, 489 F.3d 256, 259 (6th Cir. 2007). Summary judgment is appropriate when, construing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a); *Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 877 (6th Cir. 2013).

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). To prevail on such a claim, a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. *See Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013).[1] Because federal case law interpreting Title VII is generally applicable to sexual harassment claims under Ohio

---

[1] Some cases from this court have articulated the second element as "subjected to unwelcome sexual harassment," *see, e.g.*, *Smith*, 813 F.3d at 307, but we find that the articulation of the standard in *Waldo*, 726 F.3d at 813, and *Warf*, 713 F.3d at 878, more accurately reflects the rule that "[n]on-sexual conduct may be illegally sex-based and properly considered in a hostile environment analysis where it can be shown that but for the employee's sex, he would not have been the object of harassment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000); *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) ("Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment.").

state law, the same legal framework applies to both Graves's federal and state law claims. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

The parties dispute whether Graves has demonstrated a genuine question of material fact regarding the third and fourth elements of her hostile-work-environment claim. To establish that the harassment she experienced was based on her gender, Graves must show that she would not have been the object of harassment but for her gender. *Bowman*, 220 F.3d at 463. To establish that the work environment was hostile, Graves must show both that she subjectively perceived it to be hostile and that a reasonable person would have found it to be hostile. *Smith*, 813 F.3d at 309. Graves fulfilled the subjective prong by stating in her deposition that "[i]t was a hostile work environment," an allegation we accept as true from her viewpoint. Whether the work environment was hostile from an objective perspective, as well as gender-based, is the more difficult question here.

In assessing whether Graves established a genuine dispute as to the objective prong, we must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it (was) physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere(d) with an employee's performance." *Id.* (internal quotation marks and citations omitted; alteration in original).

The district court concluded that Graves failed to establish a genuine dispute as to whether the harassment was based on her gender, because the two text messages Schum sent her, although ostensibly about sex, "were gender-neutral and did not evince an anti-female animus." Describing Schum's comments as "unprofessional," the district court concluded that they "did not contain gender-specific epithets nor were they explicitly sexual or patently degrading of

women." The court went on to find that Schum's alleged harassment in the form of the two text messages was not sufficiently severe or pervasive to create a hostile work environment. We agree.

First, Schum's conduct was not harassment based on Graves's gender. "To be actionable, the harassment must consist of more than words that simply have sexual content or connotations." *Hawkins*, 517 F.3d at 333. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (citation omitted). This typically includes "explicit or implicit proposals of sexual activity," *id.*, as well as "non-sexual conduct" that evinces 'anti-female animus.'" *Williams*, 187 F.3d at 565. We have none of that here. There is no suggestion in the record that Schum or any other Dayton Gastroenterology employee expressed an anti-female animus toward Graves. There is no evidence in the record of any other sexual statements, any physical sexual harassment, or any use of derogatory language by Schum. Graves does not allege, for example, that Schum asked her to have sex with him, touched her or threatened to touch her, made any comments about her body, used language derogatory to women, or treated any of the other women in the office inappropriately. Moreover, Graves expressly denied that Schum "ever request[ed] any sort of sexual favor from [her]." She even admitted that the text messages were "inappropriate and unprofessional no matter who received [them] . . . , whether it was . . . a man or another woman."

Moreover, although "non-sexual conduct may be illegally sex-based where it evinces anti-female animus," *Williams*, 187 F.3d at 565 (internal quotation marks and citation omitted), none of the rude behavior Schum directed toward Graves after she complained to Penno about

the text messages fits this description. Instead, as Graves conceded in her deposition, Schum's conduct stemmed from his anger at Graves for reporting the text messages to Penno, not from animus based on her gender. As a result, Graves has not shown that she was subjected to unequal treatment because of her gender nor has she provided any basis for inferring that Schum's facially gender-neutral conduct was in fact discrimination based on gender. *See Waldo*, 726 F.3d at 815 (inferring a gender-discrimination basis for facially-neutral incidents from the use of gender-specific demeaning language and the ostracism of the plaintiff, the only woman in the office).

Second, even if Schum's conduct was based on Graves's gender, it was objectively neither severe nor pervasive enough to constitute a hostile work environment. At most, Schum's text messages were "isolated incidents" that do not "amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Moreover, Graves has not cited, and our research has failed to uncover, a case finding a hostile work environment under circumstances similar to the ones in this case. To the contrary, the cases we have reviewed tend to negate the existence of a hostile work environment in this case. *Compare Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (finding a genuine dispute of fact as to the existence of a hostile work environment where the plaintiff's supervisor was preoccupied with sex talk and made unwelcome, persistent, and increasingly intimidating advances); *Hawkins*, 517 F.3d at 334–35 (finding a genuine dispute of fact where the harasser repeatedly made "graphic, personal, and sexually explicit" comments and regularly touched multiple women); *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 734–36 (6th Cir. 2006) (finding a genuine dispute of fact where the plaintiff "was subject to daily threats, derogatory comments, verbal harassment, foul language, and several serious physical assaults to

which members of the opposite sex were not exposed."); *with Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351–52 (6th Cir. 2005) (comparing cases and finding no hostile work environment where the plaintiff alleged isolated incidents of her supervisor telling vulgar jokes, twice placing his vibrating pager on her thigh, and pulling on her overalls after asking what type of underwear she was wearing); *and Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 459–60 (6th Cir. 2004) (finding no hostile work environment where the plaintiff's co-worker continuously commented on women's physical appearances and spoke at the shift meetings about sleeping with different women).

Schum's behavior might have formed the basis of a successful retaliation claim, *see Hawkins*, 517 F.3d at 346 ("Title VII permits claims against an employer for coworker retaliation."); *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) ("[S]evere or pervasive supervisor harassment following a sexual-harassment complaint can constitute retaliation for the purposes of a Title VII action.") (internal quotation marks omitted), but Graves did not plead such a claim in this case. We decline to stretch the hostile-work-environment analysis to fit what is essentially a retaliation claim, because a legal framework for addressing such claims already exists. *See id.*

## CONCLUSION

Viewing the evidence in the light most favorable to the plaintiff, we conclude, as did the district court, that she has not established a genuine dispute of fact as to whether she was subjected to severe or pervasive harassment based on her gender. We therefore AFFIRM the district court's order granting summary judgment to the defendants.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** There are genuine disputes of material fact both as to whether the harassment was based on sex and as to whether it created a hostile work environment. Accordingly, I would vacate the grant of summary judgment and remand to the district court.

Kim Graves and David Schum initially had an amicable, but professional, relationship. *See* R. 18 (Graves Dep. at 99–100) (Page ID #261–62). Although they occasionally talked about their lives outside of work, Graves restricted these conversations to her work history and where she lived, as well as to limited information about her husband. *Id.* at 101 (Page ID #263). In Graves's words, "Nothing I wouldn't talk with any other professional about." *Id.* Graves and Schum did not socialize after hours either, save for one occasion when they went to lunch with another colleague. *Id.* at 100 (Page ID #262). They were not close friends who shared intimate details about each other's lives; they were friendly colleagues whose conversations were almost always about Dayton Gastroenterology. Schum's text messages cannot be divorced from this context.

In order to prevail on her hostile-work-environment claim, Graves must establish that Schum's harassment was "based on sex." *See Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016). There are a number of ways in which Graves can do this, including showing that the behavior was overtly sexual. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999). "[H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women [also] satisfies the 'based on sex' requirement." *Id.* Graves need not show that Schum was motivated by anti-female animus, however, because his text messages were overtly sexual.

Schum's text messages not only refer to "wild sex," but also they imagine Graves having it and express Schum's *desire* to have it. R. 18 (Graves Dep. at 104, Def. Ex. K) (Page ID #266, 364). Given the context of their relationship, a reasonable jury could find that Schum was trying to engage Graves in a conversation about sex, that Schum was doing this because he wanted to pursue a relationship with Graves, and that his behavior was therefore "based on sex." *See Williams*, 187 F.3d at 560. Requiring defendants to reveal their motives outright would punish only the most vulgar harassers and reward those smart enough to speak in subtleties.

That the text messages would be "inappropriate and unprofessional" whether sent to a woman or a man, as Graves acknowledged in her deposition, R. 18 (Graves Dep. at 105) (Page ID #267), does not mean that they are "gender-neutral," R. 26 (Op. at 10) (Page ID #436). Comments that are inappropriate whether said to a woman or a man may cross the line into harassing behavior when said to a woman. Social context is key. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). For example, that it would be inappropriate for a white employee to make disparaging comments about another white employee's hair does not mean that the same comments, directed at a black employee, would not constitute harassment based on race. *See generally Lovelace v. BP Products N. Am., Inc.*, 252 F. App'x 33, 36 (6th Cir. 2007). Similarly, that it would be inappropriate for a Christian employee to make comments to another Christian employee suggesting that employee dress up as Osama bin Laden for Halloween does not mean that the same comments, directed at a Muslim employee, would not constitute harassment based on religion. *See generally Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 260 (6th Cir. 2005). Finally, Schum's continued harassment of Graves need not evince an anti-female animus to be "based on sex": just as a jury could find that Schum made sexual advances

toward Graves, a jury could find that Schum's subsequent treatment of her was rooted in sexual desire and rejection.

There also is a genuine dispute of material fact as to whether the harassment created a hostile work environment. The objective component of this inquiry requires us to look at the totality of the circumstances. *Williams*, 187 F.3d at 562. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Graves alleges that after she reported Schum to their supervisor, Schum became antagonistic. R. 18 (Graves Dep. at 110–11) (Page ID #272–73). When Graves spoke to Schum, he would either respond curtly or ignore her entirely, walking away when Graves asked him questions. *Id.* at 123 (Page ID #284). Schum also gave her the most difficult assignments, including ones that required Graves work late. *Id.* at 134 (Page ID #298). Schum would not give her updated schedules, however, so she often did not find out about these assignments until the last minute. *Id.* at 123, 128–29 (Page ID #284, 289–90). When it was Schum who had to work late, he made sure Graves stayed at the office and would not let her go home until he did. *Id.* at 123–24 (Page ID #284–85). According to Graves, Schum did this at least once a week. *Id.* at 124 (Page ID #285). Schum denied Graves her lunch breaks and refused to approve her requests for days off. *Id.* at 126, 132 (Page ID #287, 293). Schum also threw a patient's medical chart at Graves while the two were in front of the patient. *Id.* at 127 (Page ID #288). These were not isolated incidents; Graves testified that Schum harassed her daily. *Id.* at 131 (Page ID #292). Accepting these allegations as true, Schum's behavior affected almost every facet of Graves's life at Dayton Gastroenterology. On this evidence, a jury could find that Schum's harassment created a hostile work environment.

I would reverse the district court's grant of summary judgment to the defendants and allow the case to proceed.  Therefore, I respectfully dissent.